IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| ROVER PIPELINE LLC, | : | |
| | : | |
| Plaintiff, | : | Case No.: 2:17-cv-105 |
| | : | |
| v. | : | CHIEF JUDGE ALGENON MARBLEY |
| | : | |
| MARK C. KANZIGG, *et al.*, | : | Magistrate Judge Kimberly Jolson |
| | : | |
| Defendants. | : | |

### REPORT AND RECOMMENDATION OF THE COMMISSION REGARDING PROPERTY OWNED BY NORTH AMERICAN

The captioned case includes a compensation dispute between Rover Pipeline, LLC ("Rover") and North American Coal Royalty Company and Bellaire Corporation (collectively, "North American").[1] Pursuant to instructions issued by Chief Judge Marbley, the dispute came on for a hearing before the Commission. *See generally* Final Order on Instructions, ECF No. 722 ("Final Instructions"). At the conclusion of the hearing, the Commission took the matter under advisement.[2] In accordance with Federal Rule of Civil Procedure 71.1 and Chief Judge Marbley's instructions, the Commission now issues its Report and Recommendation regarding the amount of compensation due to North American.

### Standard Involved

As Chief Judge Marbley explained in his Final Instructions, "[t]he Commission acts as an assessing body in determining the amount of compensation and the amount of any damages." Final

---

[1] North American Coal Royalty Company and Bellaire Corporation are both subsidiaries of North American Coal Corporation.

[2] In addition to the panel comprised of the undersigned Commissioners, Commissioners Tom Horner and G. Franklin Hinkle, II also attended the hearing as designated alternates pursuant to Chief Judge Marbley's instructions. *See* Final Instructions, ECF No. 722 at PageID 11802-11803. As alternates, Commissioners Horner and Hinkle took no part in the deliberations or in the writing of this Report and Recommendation.

Instructions, ECF No. 722 at PageID 11799. In fulfilling its duties, the Commission is bound by the Court's instructions. *Id.* at PageID 11806. This includes all relevant instructions, with no one instruction to be afforded paramount importance. *Id.* at PageID 11804, 11806.

In conducting its deliberations, the Commission adhered to the instructions provided by the Court.

## Discussion

A typical just compensation determination involves ascertaining the difference, if any, between the fair market value of the subject property before the date of the take and the value of the subject property after the take.[3] Any decrease from the pre-taking value to the post-taking value is the just compensation due to the landowner. Final Instructions, ECF No. 722 at 11814-11815. This may include damages to the residue. *Id.* at 11814. Finally, in addition to the permanent easement and damages, one or more temporary easements obtained for the purpose of constructing the natural gas pipeline can be involved. *Id.* at 11818.

The present dispute presents a just compensation determination involving whether a natural gas pipeline constructed by Rover impedes North American from mining coal from land that runs partially underneath the pipeline and along the pipeline corridor. North American does not currently operate a mine in the area in question, or anywhere in Ohio, but the company has presented plans for a proposed mine it calls the new Jensie Mine (as opposed to a nearby closed mine it once operated, the old Jensie Mine). North American seeks special damages in the amount of approximately $5.8 million based on a sales amount of $120 per ton (leading to $6.10 per ton lost for approximately 957,000 or more tons of lost coal).

Where, as here, such special damages are involved, the burden of proving by the greater

---

[3] It is settled that "the date of the take is February 2, 2017." Final Instructions, ECF No. 722 at PageID 11813.

weight of the evidence such special damage to the residue rests on the party seeking the monetary relief. *Id.* at 11813. Accordingly, North American must prove "that sufficient minerals remain to allow the commercial recovery and sale of the minerals" and must prove "beyond mere speculation that Rover's actions have impeded [North American's] ability to access those same minerals." *Id.* at 11819.

Rover disagrees with North American's theory of the case. The pipeline company asserts that North American's entire new mining plan is speculative because North American has a 400-acre coal estate, which is not the 4,000 acres required for the commercially and economically viable mine that North American proposes. The parties disagree on whether North American can argue and has proven that it can assemble coal interests it does not presently own to create the proposed mine. Rover then asserts that even if North American obtained sufficient mining interests to create the proposed mine, there is no evidence that there is enough coal in the area for operation of a viable mine. Finally, Rover argues that even if there were coal throughout the area involved, it is lower-grade thermal coal and not the metallurgical coal necessary to obtain the price needed to create a commercially and economically viable mining operation.

The Commission received evidence on these issues at the just compensation hearing, which commenced on August 16, 2022, and concluded on August 19, 2022.[4] North American presented its case first. In addition to a company representative, the company presented testimony from an opinion witness, Dennis Kostic, who is a mining engineer and chief executive officer at a mining,

---

[4] Pursuant to the instructions of the Commission Chair, Rover has supplied the Commission with a copy of the certified transcript of the August 2022 Compensation Hearing. Hrg. Tr. at 774:9-11. A copy of that transcript has not been filed on the docket. All references to the hearing transcript are to the original pagination of that transcript. Rover is now directed to file a copy of the four-volume hearing transcript within three business days of the filing of this Report and Recommendation so that the transcript is readily available to the Court. Hrg. Tr. at 774:12-15.

engineering, and geological consulting company. Hrg. Tr. at 109:21025 to 110:1. Kostic testified at length regarding whether, in his opinion, North American could and should mine under the pipeline. More important for present purposes, he also testified regarding the viability of North American's proposed new Jensie Mine and his conclusion that North American's special damages amounted to approximately $5,837,700 to $5,847,000 at the time of the take. *Id.* at 123:9-13, 218:12-14.

Kostic testified that he "did basically a feasibility study of the new Jensie Mine." *Id.* at 124: 23-25. He explained that this involved looking at the property involved, the type of coal to be mined, the geologic structure of the coal seam involved (identified as Lower Freeport Seam 6A), and existing drill holes that had been drilled in the area. *Id.* at 124:25 to 125:1-14. Kostic testified that this resulted in the development of a model plan that was then informed by production, productivity, and operating costs to arrive at a net value mine operation. *Id.* at 125: 14-15 to 126:1-8. Adjustments to the plan were made to account for the location of the Rover pipeline. *Id.* at 126:12-25 to 127:1-3.

Kostic opined on the quality of the coal involved in the proposed mine. He testified that the coal under the proposed mine was metallurgical coal. *Id.* at 131:10-12. Kostic based this conclusion on coal obtained from elsewhere in the seam in a different part of Ohio in 2012. *Id.* at 132:7-25 to 133:1, 136:11-13, 137:6-10. Dismissing the high sulfur content of these samples, Kostic testified that he had no doubt that they could be sufficiently reduced by washing with modern techniques. *Id.* at 139:25 to 140:1-11, 149:15-25. Kostic also noted that coal from the Lower Freeport 6A seam had reportedly been mined for coking coal as recently as 1950 and that coking coal was synonymous with metallurgical coal. *Id.* at 141:14-25, 142:9-17, 144:18-25 to 145:1-4.

Kostic opined that North America would be able to acquire the 11,748,000 tons of coal

rights needed for the proposed mine. *Id.* at 226:12-17. He testified that North American would be able to assemble the acreage for the new Jensie Mine at an estimated cost of approximately $500 per acre for an overall cost of $2.9 million. *Id.* at 228:23-25 to 229:1-15, 270:7-16. In addition, he testified, North American would pay a standard six percent royalty to the landowners on the sales price of the coal mined. *Id.* at 229:6-7, 270:17-25 to 271:1-9.

In explaining the plan for the proposed new Jensie Mine, Kostic indicated that there were no core samples or bore samples showing the thickness of the seam for entire southern half of the plan. *Id.* at 279:21-25 to 280:1, 281:5-8. Rather, he testified that he relied on samples from other portions of the area to estimate the thickness of the coal present in the southern part of the plan; this estimate indicated that while there are areas of zero coal throughout the plan, the average thickness of the mine plan is an estimated 4.5 feet. *Id.* at 282:12-25. Kostic emphasized that this process was for a feasibility study and not for a resource study in which the estimate would be deemed "inferred tonnage." *Id.* at 280:14-25 to 281:1-2. He testified that he was not asked to do any bore hole sampling or core sampling by North American. *Id.* at 285:3-9. Kostic agreed that, in conducting his feasibility study, he recommended drilling for more samples. *Id.* at 287:22-25 to 288:1-8.

Kostic testified that there was not one quality core sample taken from the proposed new Jensie Mine, opining that none was needed. *Id.* at 289:24-25 to 290:102. Notably, he could not remember if he had ever done another feasibility study without having obtained core samples from the actual area to be mined. *Id.* at 290:15-18. He speculated that he *possibly* did so, although he did not provide a specific project and ultimately concluded that he could not remember *Id.* at 291:15-25 to 292:1-7-25, 293:1-4.

Kostic testified that the coal samples tested were from another area of the seam and that, although these samples had a too-high sulfur content, he could reduce the sulfur content by

5

washing the coal. *Id.* at 300:2-25 to 301:1-3. To support this contention, Kostic relied upon a 1969 research report titled Evaluation of Coal Cleaning Processes and Techniques for Removing Pyritic Sulfur from Fine Coal. *Id.* at 301:25 to 302:1-8, 302:23-25 (discussing Joint Ex. 3). He opined that with unspecified "advances so far today with new technology," he could achieve the sulfur reductions sought in the article. *Id.* at 302:408. Kostic testified that there were no processing plants in Ohio that were reducing sulfur as much as was needed here and selling the washed coal and metallurgical-quality coal. *Id.* at 307:17-24. Moreover, he testified that the only mine producing from the Lower Freeport 6A seam (the relevant seam in this dispute) is mining and producing thermal coal, not metallurgical-quality coal. *Id.* at 209:20-25 to 310:1.

Kostic opined that North American's proposed new Jensie Mine would produce 13 million tons of metallurgical-quality coal. *Id.* at 312:16-21. He testified that, to be an economically viable mine, the coal had to sell for somewhere around or over $80 per ton. *Id.* at 316:24-25 to 317:1-7.

Rover also offered an opinion witness, engineer Ronald Lewis, who is the managing director and chief operating officer of a mine consultancy company. *Id.* at 446. He testified that he examined the proposed mine plan, including valuing the coal, in addition to analyzing the studies relied upon by Kostic. *Id.* at 450:10-17. Lewis testified that "it is speculative assumption that the quality of the coal is metallurgical" and that in his opinion, the coal was "basically thermal coal." *Id.* at 453:19-21, 453:23-24.

In addition, Lewis testified that, as of the date of the take, North American clearly could not establish the proposed mine. *Id.* at 454:11-21. He explained that North American owns only 10 percent of the coal necessary to develop the proposed mine. *Id.* at 456:2-7. Lewis also testified that the coal involved was inferred coal, which he described as a "speculative categorization" and later as "unreliable." *Id.* at 468:19-22, 499:2-4. He noted that there were no core samples from the southern part of the proposed new Jensie Mine and that based on the single core sample from

the map, it showed zero coal present. *Id.* at 468:23-25 to 469:1-12. Lewis also testified that he deemed North America's leasing plan to obtain sufficient leasing rights to be speculative. *Id.* at 501:17-23, 502:13-22, 503:4-13.

Lewis described the value of the coal at the new mine area as "uneconomic," *Id.* at 512:5-9, 512:12-14. To support this conclusion, he cited the fact that coal being recovered from the Hopedale Mine at the date of the take was selling for an average of $41 per ton; the Hopedale Mine is five miles from the proposed mine and along the same Lower Freeport Seam 6A. *Id.* at 513:2-25 to 514:8. Lewis testified that selling the coal at $41 per ton would mean that the proposed new Jensie Mine "would be uneconomical." *Id.* at 515:14-19. Moreover, he explained, the available data did not support North American's contention that coal from the proposed new Jensie Mine could be sold for $120 per ton on the day of the take. *Id.* at 515:1-5. This was because, Lewis testified, the lack of washability data on coal obtained from the data points near the proposed new Jensie Mine means "we are left to speculate on what could potentially be done to the raw coal samples by processing the coal." *Id.* at 515:6-21. In fact, Lewis testified that, on the day of the take, there was no coal being sold in Ohio at $120 per ton, there was no metallurgical coal being sold in Ohio, there were no metallurgical coal mines being operated in Ohio, and the Hopedale Mine was producing and selling only thermal coal. *Id.* at 516:3-19.

Lewis then testified that the old Jensie Mine had sold only thermal coal. *Id.* at 517:6-10. Similarly, he testified that the mine directly north and directly south of the proposed new Jensie Mine only sold thermal coal. *Id.* at 517:11-15. Lewis noted that these mines mined the 6A seam, the same seam that the proposed new Jensie Mine would mine. *Id.* at 517:16-21.

As an industry standard, Lewis stated, a representation as to the quality of the coal involved in the proposed mine feasibility study should rely on some on-site drilling samples. *Id.* at 518:22-25. He stated that in his 50 years of experience of doing mine studies and coal valuations, he could

not recall ever seeing a mine feasibility study that did not include coal quality samples for the coal to be mined. *Id.* at 518:10-15. Lewis similarly faulted Kostic's failure to reference other tests or characteristics of metallurgical coal in Kostic's discussion of washing coal to sell as metallurgical coal. *Id.* at 524-525.

After walking the Commission through the washing process, Lewis opined that the coal from the area involved had too high a sulfur content to be suitable for metallurgical coal unless it was used "as a very small amount of filler coal" and blended "with much better coals." *Id.* at 529:16-25. He concluded that the coal was not suitable for metallurgical used as a standalone coal. *Id.* at 530:1-11.

Lewis then offered his opinion of the 1969 research report that Kostic had relied upon in discussing washing, the document titled Evaluation of Coal Cleaning Processes and Techniques for Removing Pyritic Sulfur from Fine Coal. *Id.* at 542:3-25 to 543:1. He explained that the study was not looking at metallurgical coal but was instead a research-oriented fine coal study. *Id.* at 543:3-20. The study involved pulverizing the coal, which Lewis testified is not done in any coal preparation plant in Ohio. *Id.* at 543:22-25. In other words, Lewis explained, what was discussed in the report was not what was happening in actual commercial preparation plants; the report was limited to what was done in a research center. *Id.* at 546:7-15. He explained that the 90% sulfur reduction simply could *not* happen because coal processed at a preparation plant would not be crushed like the coal in the report given that a metallurgical-coal purchaser would not purchase pulverized coal. *Id.* at 547:11-25 to 548:1-19, 549:5-9. Lewis concluded that the 1969 report did not support Kostic's washing assertions but in fact contradicted them. *Id.* at 550:16-25 to 551:1-2.

On cross-examination and again on re-direct, Lewis testified that he concluded 67,000 tons of coal was lost for mining due to the Rover pipeline if mining were attempted. *Id.* at 595:25 to

8

596:1-6, 663:17-19, 668:5-7. He computed the lost value to be $894,000 at an assumed $120 selling price. *Id.* at 599:11-20, 600:3-9, 669:2-13. On re-direct, Lewis opined that, given the costs of production, the new Jensie Mine is not commercially viable. *Id.* at 668:8-11, 668:18-23. He explained that the selling price would not be $120 per ton and that at prices of $40 to $50 per ton, the mine would be in negative numbers. *Id.* at 670:1-16. Even when Lewis substituted in 276,000 tons for the 67,000 tons, it failed to produce sufficient numbers to establish a commercially viable mine. *Id.* at 678:19-25 to 679:1-22. In other words, no just compensation is due. *Id.* at 670:12-16.

Taking all the foregoing testimony into account, as well as review of the admitted exhibits and other testimony not expressly summarized here, the Commission agrees with Lewis' ultimate conclusion of no just compensation.

As a threshold analytic point, the Commission will assume only for the sake of argument that the pipeline and the proposed operating mine underneath cannot co-exist.[5] This leads to the core issue in this dispute: whether North American has met its burden of establishing special damages based upon a Rover-induced inability to conduct an otherwise commercially and economically viable mining operation. Resolution of this core issue turns on two components that necessarily go hand in hand: whether there is a sufficient *quantity* of coal for a commercially and economically viable mine and whether the coal is of sufficient *quality* for a commercially and economically viable mine.

At the hearing, Rover moved for a directed verdict on the grounds that North American lacked ownership interest of enough coal to constitute a viable mine. It is undisputed that North

---

[5] This assumption, which is made only for analytic purposes and is not a finding of the Commission, moots Rover's hearing argument regarding whether Rover has impeded North American. In other words, the dispute over the ability to conduct room-and-pillar mining and the debate over subsidence are not dispositive factors in today's recommendation.

American does not own interests in a sufficient quantity of coal to present a commercially and economically viable mining operation. Consequently, the new Jensie Mine proposed by North American is a compilation of interests that North American insists it could assemble to create the mine for which it seeks compensation. The parties disagree whether North American can rely on assembling adjoining property coal interests owned by others to establish the commercially and economically viable mine.

North American asserts that it is industry practice that it can assume successful assembly of the interests necessary to create a viable mine plan to warrant compensation here. Rover counters that Chief Judge Marbley's instructions do not even address—much less provide for—assemblage and that North American, having failed to request and obtain a supplemental instruction on the issue, seeks for the Commission panel to accept a purported industry practice as a backdoor means to amend the instructions and thereby treat the assemblage argument asserted as a correct statement of Ohio law applicable to the instant proceeding.

This moot dispute is ultimately immaterial to the determination of the compensation award recommendation.[6] Even assuming *arguendo* that assemblage is theoretically permissible, the Commission finds the degree or scope of assemblage contemplated here too widely speculative to constitute anything more than an insufficient hypothetical that lacks crediting. Kostic relied on North American's number estimations for procuring the interests needed, and there is little basis in the record for the Commission to accept those estimates as viable.

---

[6] At the hearing, the parties disagreed over whether it was permissible for Rover to present two cases to the Commission during closing arguments. The Chair took the issue under advisement and indicated that this Report and Recommendation would include a determination on whether the introduction of the cases was permissible. Hrg. Tr. at 775:6-10. Given the analytic path of this Report and Recommendation and the assumptions made of the sake of argument, the content of the cases and Rover's reliance on them is irrelevant. Because the cases did not inform today's recommendation, Rover's motion to rely on the cases is deemed moot.

The viability of the estimates is hardly dispositive, however, because even assuming further *arguendo* that North American would theoretically be able to obtain the interests involved and that such assembly can be credited here under the Court's instructions, the fact remains that *North American has wholly failed to convince the Commission that there is enough coal, much less metallurgical-quality coal, to be mined in the area at issue to establish a commercially and economically viable mine*.

North American posits that there are ample tons of sufficiently valuable coal to mine, but undisputed evidence undermines this contention.

There has been a dearth of metallurgical-quality coal produced in Ohio. In 2012, no such coal was produced. *Id.* at 312:13-15. In 2013, 104,000 tons of metallurgical-quality coal was produced. *Id.* at 312:11-12. In 2014, that number fell to 94,000 tons. *Id.* at 312:9-10. In 2015, the number plummeted to 6,000 tons. *Id.* at 312:5-7. Finally, in 2015, 2016, and 2017, there was no metallurgical-quality coal produced in Ohio. *Id.* at 311:2-5, 311:23-25 to 312:1-4. This undercuts the proposition that there are 13 million tons of metallurgical-quality coal to be mined here.

The only test in evidence shows *zero coal* in the southern portion of the mine. Even Kostic, North American's expert, testified that he recommended more testing. The Commission cannot credit what amounts to mere speculation as to the amount of coal involved. There is simply no factual predicate in the record upon which to base North American's assertion of quantity or, in fact, on which the Commission could logically and justifiably infer *any* amount of coal.

Evidence indicates that the only mine operating in proximity to the area—the mine operating in the Lower Freeport 6A seam—is producing thermal coal, not the metallurgical-quality coal upon which North American relies to argue that a commercially and economically viable mining operation is possible.

11

Equally speculative is North American's conjecture regarding the *quality* of any coal present. North American asserts that metallurgical-quality coal is involved, and Rover disagrees. As North American's counsel stated at the hearing, this "important issue" is "really the foundation of the economic analysis here." Hrg. Tr. at 766:6-8.

The uncontroverted evidence presented to the Commission is that the sulfur content of any coal present is too high to be sold as metallurgical-quality coal. Kostic testified that he has a "modern" methodology for reducing the sulfur content to reach that quality of coal; he claims his washing process would result in sulfur reductions of 85 or 90 percent. But he was not able to point to a single modern study or report or document to support his premise. Nor did Kostic name a single individual or a single company anywhere that was realizing such washing results. Instead, he stated that he would not discuss what specific client and what specific documentation he was relying upon because it was confidential; similarly, North American failed to produce any such documentation in discovery. *See id.* at 152:10-25 to 158:1-7.

This Commission is not simply going to accept Kostic's testimony in which, in the words of North American's counsel, "basically he says all prep plants are capable of doing this." *Id.* at 156:13-18. That is a broad, wholly unsubstantiated statement that is nothing more than sheer *ipse dixit*. The Chair sustained Rover's objection to the questioning at the hearing, and rather than heed the caution that there was an unfavorable inference and rehabilitate Kostic's "I won't tell you why you should believe me" approach, North American elected to simply move on to another topic. *Id.* at 158:5-9. The Commission cannot accept "trust me, everybody can do this" as a persuasive basis for a favorable finding of fact on such a critical issue—especially when the uncontroverted evidence is that *no one* is doing this in Ohio. Even Kostic testified that no coal has been sold as metallurgical coal in Ohio in recent years other than "small amounts" in 2013, 2014, and 2015, and the coal sold from the 6A seam in a neighboring county has been sold as thermal coal. *Id.* at

158:23-25 to 159:1-20.

Kostic attributes the lack of metallurgical coal sales in Ohio to demand, which he testified was changing. *Id.* at 159:21-25 to 160:1-16. Based on the record evidence, however, there is no basis to accept that his conclusory analysis is correct or that, even if demand is indeed a changing driver of such sales, the coal could be sufficiently washed to be sold as metallurgical coal to meet that demand. Kostic is again asking the Commission to accept his unsupported statements as fact when his credibility on the specific issue is less than persuasive.

In contrast to Kostic, Rover's opinion witness, Lewis, testified that washing the coal would at best result in a 50 percent reduction in sulfur content. Lewis' testimony is in accord with the Ohio Department of Natural Resources document relied upon by Kostic. Moreover, Lewis explained that no one in Ohio has employed the "modern" techniques Kostic promotes. He credibly and cogently explained why the proposed mining operation was simply not economically viable at multiple amounts of tons assumed lost to recovery.

The difference in impact of these opinion witnesses' testimony is significant. Chief Judge Marbley instructed the Commission how it may evaluate opinion testimony:

> A witness who has specialized knowledge due to knowledge, skill, experience, training, or education may testify and state an opinion concerning such matters. No commissioner has to accept this opinion. In deciding how much weight to give it, a commissioner should consider the witness' qualifications and how he or she reached his or her conclusions. Each commissioner should also consider the other factors discussed in these instructions for weighing the credibility of witnesses. The commissioners alone decide how much of a witness' testimony to believe and how much weight it deserves. In assessing the qualifications of a witness and the admissibility of his or her opinion testimony, the commission should apply the standards set forth in *Daubert v. Merrell DowPharmaceuticals, Inc.*, 509 U.S. 579 (1993), and its progeny.

Final Instructions, ECF No. 722 at PageID 11811. Applying these tests, the Commission found Lewis to be the more credible and compelling opinion witness.

Lewis based his opinion on primarily direct evidence that testing and the literature

13

presented backed up.  Kostic in turn discussed more theoretical washing methods and procedures that were not shown to be subject to much if any real testing or implementation at actual preparation plants, that were not shown to have been subject to much if any peer review and/or substantive discussion in the literature, and that were not shown to enjoy general acceptance in the relevant scientific community.  *See Nelson v. Tennessee Gas Pipeline Co.*, 243 F.3d 244, 251 n.5 (6th Cir. 2001) (citing *Daubert* factors).  Although Kostic's testimony was sufficiently reliable to be admissible, the actual weight afforded to this testimony is minimal at best.  His testimony falls far short of such persuasive quality as to convince the Commission to accept his conjecture as sufficiently reliable to reasonably permit drawing the many inferences that North America asks to be drawn.

Stated simply, North American's theory of the case relies on speculation built on speculation without an adequate basis to support the unsubstantiated assumptions and inferences upon which North American relies.  This is problematic for North American under Chief Judge Marbley's Final Instructions to the Commission.  Those instructions provide:

> [T]he Commission is not limited to the mere statements of the witnesses, but is also permitted to draw, from the facts that the Commission finds have been proved, such reasonable inferences as seem justified in light of the commissioners' own experiences.  That is to say, from the facts that have been proved, each commissioner may draw an inference based upon reason and common sense.

Final Instructions, ECF No. 722 at PageID 11807.  The Commission is thus limited to the evidence and the record before it, as well as all reasonable inferences drawn therefrom.  Here, however, the record contains no evidence of sufficient coal, much less metallurgical-quality coal, to support a commercially and economically viable mine and therefore a special damages award.

The record evidence simply does not permit a reasonable inference that sufficient valuable coal exists in the area in question.  Even if the Commission were to accept Lewis' one estimate of

14

67,000 lost tons of coal, the Commission cannot make the next requisite inference that this amount (or even the 276,000 tons) of coal is of sufficient quality to support a commercially and economically viable mining operation. North American asking the Commission to credit the coal there as metallurgical-quality coal simply asks too much when there was not a single coal sample from the new Jensie Mine area taken and tested, when there has been no metallurgical-quality coal sold in Ohio for years, and when there is no reason to believe that "modern" washing techniques will sufficiently cut the sulfur content.

There is a notable lack of evidence to support that the coal can be sold as metallurgical-quality coal to obtain the amount necessary to constitute a commercially and economically viable mining operation. If the coal is not metallurgical coal, then it would sell at the thermal coal price as of the date of the take. Selling thermal coal at $40 to $45 per ton is far from the necessary break-even point of $80 or more likely $90 per ton to make the mining project viable; in Kostic's words, "you wouldn't put the mine in if it was a thermal coal product." *Id.* at 260:2-17, 260:22-25 to 261:1. Kostic agreed with the proposition that "in order for the mine plan to be viable, it has to be metallurgical coal, based upon 2017 prices." *Id.* at 261:2-5.

North American has not convinced the Commission that sufficient metallurgical coal is present here. Mere speculation does not meet North American's burden. Having observed the witnesses and having weighed the evidence, the Commission concludes that it cannot credit North American's quantity and quality inferences as reasonable.

As Chief Judge Marbley instructed, "[t]o infer, or to make an inference, is to reach a reasonable conclusion of fact that [the commissioners] may make, but are not required to make, from other facts that [the commissioners] find have been established by direct evidence." Final Instructions, ECF No. 722 at PageID 11808. No direct or even circumstantial evidence sufficiently suggests that there is enough coal in the proposed mine to constitute a commercially and

15

economically viable mining operation. In fact, Rover presented both direct and circumstantial evidence countering that proposition.

If North American had presented evidence of more testing suggesting the existence of sufficient coal to support a viable new Jensie Mine, at least part of the equation may have been different. But no such tests were conducted, and no such evidence was presented to counter the direct evidence and reasonable inference that the area at issue simply does not have sufficient coal deposits.

Similarly, no direct or circumstantial evidence sufficiently suggests that the coal that is present can be sold as metallurgical-quality coal. The direct evidence in fact supports that the coal present is of lesser quality, and the reasonable inference is that any greater amounts of the goal that may exist would be equally high in sulfur content to fall outside constituting metallurgical-quality coal. The suggestion that washing the coal would sufficiently reduce the sulfur content is an unreachable inference; there was contrasting evidence on the issue, and the skeptical Lewis presented a more credible witness in this regard. Kostic's contrary testimony was simply too speculative, too unproven, and too obtuse as opposed to reasonably probable to support the inference that North American asks this Commission to draw.

All of this leads to an admittedly unexpected and arguably atypical result. The instant just compensation determination is somewhat unusual because it does not involve permanent or temporary easements or typical damage to the residue. Instead, the Commission is tasked with conducting a single necessary calculation, that of calculating special damages to the coal interests of North American. The burden of proving special damages to make that calculation necessary and possible rests on North American, which has failed to present credible evidence sufficient to

meet that burden.[7]

The recommended just compensation award for North American is $0.00.

### Recommendation

At issue is whether Rover's pipeline impedes North American from mining coal from the land involved and, if so, what is the value of the damage to North American to constitute just compensation. The task before the Commission is to recommend the just compensation due North American. Based on the foregoing findings and discussion, it is the unanimous recommendation of the Commission that the Court order the just compensation due North American is $0.00.[8]

The parties involved in this compensation dispute are reminded that "a party involved in the hearing with which [this report and recommendation] is concerned may file specific and detailed objections to—or a motion to adopt or modify—the [report and recommendation] no later than eleven (11) days after a copy is served." Final Instructions, ECF No. 722 at PageID 11801.

**IT IS SO ORDERED.**

/s/ Shawn Judge
Shawn Judge (0069493)
Commission Chair


/s/ Craig Paynter
Craig Paynter
Commissioner


/s/ April Bott
April Bott
Commissioner

---

[7] North American's failure to meet its burden of proving special damages renders the parties' debate over whether North American can properly use the operational income method in calculating those damages moot. Accordingly, the Commission expresses no opinion on this issue.

[8] Given that the Commission's deliberations have concluded, the hearing exhibits will now be delivered by the Chair to the Court. *See* Final Instructions, ECF No. 722 at PageID 11802.