IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| ROVER PIPELINE LLC, | : | |
| | : | |
| Plaintiff, | : | Case No.: 2:17-cv-105 |
| | : | |
| v. | : | CHIEF JUDGE ALGENON MARBLEY |
| | : | |
| MARK C. KANZIGG, *et al.*, | : | Magistrate Judge Kimberly Jolson |
| | : | |
| Defendants. | : | |

**REPORT AND RECOMMENDATION OF THE COMMISSION
REGARDING PROPERTY OWNED BY TERA, LLC**

The captioned case includes a compensation dispute between Rover Pipeline, LLC ("Rover") and TERA, LLC ("TERA"). Pursuant to instructions issued by Chief Judge Marbley, the dispute came on for a hearing before the Commission on October 25, 2023. *See generally* Final Order on Instructions, ECF No. 722 ("Final Instructions"). At the conclusion of the hearing, the Commission took the matter under advisement.[1] In accordance with Federal Rule of Civil Procedure 71.1 and Chief Judge Marbley's instructions, the Commission now issues its Report and Recommendation regarding the amount of compensation due to TERA.

**Standard Involved**

As Chief Judge Marbley explained in his Final Instructions, "[t]he Commission acts as an assessing body in determining the amount of compensation and the amount of any damages." Final Instructions, ECF No. 722 at PageID 11799. In fulfilling its duties, the Commission is bound by the Court's instructions. *Id.* at PageID 11806. This includes all relevant instructions, with no one

---

[1] In addition to the panel comprised of the undersigned Commissioners, Commissioner Tom Horner also attended the hearing as a designated alternate pursuant to Chief Judge Marbley's instructions. *See* Final Instructions, ECF No. 722 at PageID 11802-11803. As an alternate, Commissioner Horner took no part in the deliberations or in the writing of this Report and Recommendation.

instruction to be afforded paramount importance. *Id.* at PageID 11804, 11806.

In conducting its deliberations, the Commission adhered to the instructions provided by the Court.

## Discussion

A typical just compensation determination involves ascertaining the difference, if any, between the fair market value of the subject property before the date of the take and the value of the subject property after the take. Any decrease from the pre-taking value to the post-taking value is the just compensation due to the landowner. Final Instructions, ECF No. 722 at 11814-11815. This may include damages to the residue. *Id.* at 11814. Finally, in addition to the permanent easement and damages, one or more temporary easements obtained for the purpose of constructing the natural gas pipeline can be involved. *Id.* at 11818. Pursuant to the Commission instructions, "[t]he measure of compensation for a temporary taking is the fair market value of the loss of use of the property taken. That fair market value is the fair rental value." *Id.* Additionally, "[f]air market value is the amount of money that could be obtained on the market at a voluntary sale of the estate for purposes of obtaining a permanent easement." *See id.* at 11814.

The present just-compensation dispute involves five parcels of land owned by TERA in Belmont County, Ohio.[2] In order to build a natural gas pipeline, Rover Pipeline acquired temporary and permanent easements on the TERA property. Necessary repairs related to subsequent "slips" required two-year extensions on the temporary workspace easements. The issues before the Commission are the value to TERA of the extended temporary workspace

---

[2] Parcels 71 and 72 are comprised of 68.566 acres. Parcels 73 and 74 are comprised of 59.645 acres. Parcel 75 is comprised of 61.76 acres. *See* Hrg. Tr. at 45:2-4, 10-11, and 15. *See also* Hrg. Ex. 18 at 1 (letter), 19 at 1 (letter), and 20 at 1 (letter).

There was no request for a property view by the Commission, and no such view was held.

2

easements that Rover obtained and the value, if any, resulting from any possible damages to a pond and top soil following the take.[3] It is settled that "the date of the take is February 2, 2017." Final Instructions, ECF No. 722 at PageID 11813.

The just compensation hearing on TERA's property took place on October 25, 2023.[4] Only Rover appeared and presented hearing testimony on the just compensation issues. This involved testimony by Rover's expert, certified general real estate appraiser James A. Herbig of Integra Realty Resources. Echoing his three appraisal reports, Herbig testified to his opinions, which he described were held to "a reasonable degree of professional certainty." Hrg. Tr. at 37:7-16.

Chief Judge Marbley instructed the Commission how it may evaluate opinion testimony such as that offered by Herbig:

> A witness who has specialized knowledge due to knowledge, skill, experience, training, or education may testify and state an opinion concerning such matters. No commissioner has to accept this opinion. In deciding how much weight to give it, a commissioner should consider the witness' qualifications and how he or she reached his or her conclusions. Each commissioner should also consider the other factors discussed in these instructions for weighing the credibility of witnesses. The commissioners alone decide how much of a witness' testimony to believe and how much weight it deserves. In assessing the qualifications of a witness and the admissibility of his or her opinion testimony, the commission should apply the standards set forth in *Daubert v. Merrell DowPharmaceuticals, Inc.*, 509 U.S. 579 (1993), and its progeny.

Final Instructions, ECF No. 722 at PageID 11811. Applying these tests, the Commission found Herbig to be a credible and compelling opinion witness.

Pursuant to additional instructions from Chief Judge Marbley, "[t]he property must be

---

[3] The parties previously signed an agreement regarding the permanent easements. Those easements are not before the Commission.

[4] Pursuant to the instructions of the Commission Chair, Rover has supplied the Commission with a copy of the certified transcript of the October 25, 2023 Compensation Hearing. Hrg. Tr. at 128:15-18. A copy of that transcript has not been filed on the docket. All references to the hearing transcript are to the original pagination of that transcript. Rover is directed to file a copy of the hearing transcript immediately so that the transcript is readily available to the Court.

valued for the most valuable use for which it may reasonably, lawfully, and practically be used. This is called the highest and best use." Final Instructions, ECF No. 722 at PageID 11815. Herbig testified that the highest and best use of Parcels 71, 72, and 75 before and after the pipeline easement was rural recreational use and that the highest and best use of Parcels 73 and 74 before and after the pipeline easement was rural recreational and residential. *See* Hrg. Tr. at 45:16-24, 46:1-15.

Herbig then testified that the best indication of value is a sales comparison approach. *See id.* at 47:5-22. Chief Judge Marbley has instructed the Commission that "[b]ona fide sales of comparable properties, made within a reasonable time before the date of taking of the property involved may be the best obtainable evidence of market value at the time of taking." Final Instructions, ECF No. 722 at PageID 11811.

In applying the sales comparison approach in his three appraisals, Herbig testified that he compiled a list of five comparable Belmont County sales, three of which had ponds and all of which were "used pretty much for rural recreational-type uses." Hrg. Tr. at 48:16-21, 50:9-24 to 51:1-3. Relying on these sales, Herbig concluded that a fair market value for the TERA's parcels 71, 72, and 75 was $3,500 an acre and that the fair market value for parcels 73 and 74 was $3,700 an acre. *Id.* at 51:8-16.

Herbig then testified how he utilized these fair market, per-acre values to arrive at a just compensation number. Pursuant to Chief Judge Marbley's instructions, it is well settled that "[t]he measure of compensation for a temporary taking is the fair market value of the loss of use of the property taken" and "[t]hat fair market value is the fair rental value." Final Instructions, ECF No. 722 at PageID 11818. Herbig tracked this approach. He explained:

> [W]e came up with a -- basically a rate of return that an investor might want, and we estimated ten percent.

4

> . . .
>
> So we take the $3,500 per acre that we arrived at, or $3,700 on parcels 73 and 74, times the temporary workspace easement, in this case, it was for two -- ten percent return, and it was for two additional years; and that's the calculation that we came up with then.

Hrg. Tr. at 52:16-24 to 53:1-2. Note the application of the 10% rate of return for estimated reasonable rent based on the Fee Simple Value, which Herbig perhaps explained better in his three appraisal reports than in his testimony. *See* Hrg. Ex. 18 at 43-33, Ex. 19 at 43-44, and Ex. 20, at 44-45. He based the estimated rate on interviews with real estate and governmental parties familiar with land leases. *See* Hrg. Ex. 18 at 43, Ex. 19 at 43, and Ex. 20 at 44.

For parcels 71 and 72, Herbig applied the $3,500 per acre calculation to the easement area of 5.77 acres. Hrg. Tr. at 53:6-8. For parcels 73 and 74, Herbig applied the $3,700 per acre calculation to the easement area of 2.66 acres. *Id.* at 53:11-13. And for parcel 75, Herbig applied the $3,500 per acre calculation to the easement area of 5.74 acres. *Id.* at 53:16-19. Moreover, Herbig used a two-year rental term for all of these parcels. *Id.* at 57:7-10.

Herbig testified that he included an additional temporary easement area of .008 acres in his final calculation to account for slippage that had not been counted in the original two-year temporary easements or the extended two-year temporary easements. *Id.* at 53:20-24 to 54:1-2. Consequently, he testified, he had calculated this easement for four years. *Id.* at 54:2-4, 57:10-12.

Based on the easement sizes, the fair market values, the rate of return, and the rental periods, Herbig offered the following opinion as to the value of the temporary workspace acreage for parcels 71 and 72:

> It's just a mathematical calculation of the 3,500 times the 5.77 acres. Came up with a temporary easement value of 20,195. So basically renting or leasing that land for a period of two years at a ten percent return, and came up with $4,040 rounded.

*Id.* at 57:21-25 to 58:1-6. He opined as follows on the value for parcels 73 and 74:

5

> Same mathematical calculation. In this case, we used $3,700 an acre. Uhm, came up with a fee simple value of the temporary easement area. Ten percent return for two years, $1,970 rounded.

*Id.* at 58:13-17. He then opined as follows on the value for parcel 75, which included the additional four-year term:

> Again, the same calculation. 3,500 times the 5.74 acres at a ten percent return for two years for the temporary workspace easement that was previously compensated for, and then the slippage of .008 acres at the 3,500, ten percent return for four years, to come up with $4,030.

*Id.* at 59:3-8. Thus, Herbig testified, the total value of the temporary workspace extension for parcels 71, 72, 73, 74, and 74 comes to $10,040. *Id.* at 59:9-13.

Herbig also testified that there was no damage to the residue in this case. *Id.* at 59:24 to 60:1-2, 13-17. He testified that he had conducted a site inspection on September 28, 2023 (*id.* at 60:20-22) and that there was no evidence of top soil damage given that "[t]he vegetation growth on the right-of-way and the temporary workspace was exactly the same as the vegetation on the entire property that wasn't wooded areas." *Id.* at 64:21-24. He explained why this matters:

> Q. And how did that affect your opinion that there should be no diminution of the value of the property attributed to Tera's allegation of top soil loss?
>
> A. With the vegetation being exactly the same pretty much on the entire property, I don't know why there would be a diminution in value for loss of top soil when, like I say, the vegetation is exactly the same on and off the right-of-way.

*Id.* at 65:8-17. This testimony echoes his reports' opinions, which he read into the hearing record:

> "We were made aware of the landowner's allegations that Rover's construction activities resulted in a loss of top soil through-out the entirety of the easement area affecting vegetation growth. On September 28th, 2023, an onsite inspection was completed. At the time I observed vegetation growth on the right-of-way that appears consistent with vegetation growth off of the right-of-way. This includes vegetation growth on the abutting pipeline easement that existed prior to Rover's construction. In my experience, the vegetation growth on the right-of-way was consistent with my highest and best use determination. Therefore I attributed no diminution in value of the subject property for loss of top soil."

*Id.* at 66:2-17.

Herbig testified that he also inspected the pond during his September 28, 2023 site visit. *Id.* at 69:13-19. He testified that the pond appeared to be functional and to be in similar condition to other ponds he has viewed on other rural recreational properties. *Id.* at 71:1-7. Herbig testified that he could not determine that Rover was causing sediment to enter the pond. *Id.* at 71:8-11. Finally, he testified that ponds of this nature of rural recreational property typically do not affect the fair market value of the property. *Id.* at 71:19-22. Herbig then read into the hearing record the opinion he provided in his report:

> "Rover tract 75 has a pond of approximately one acre in size. This pond was constructed in what is believed to be 1986. At the time of construction (per the current owner), the pond was approximately 14 feet in depth. On the onsite inspection, the current owner stated that he believes the pond is currently only in the range of eight feet in depth. He believes that because of Rover's pipeline construction that the pond has received sediment that has decreased the overall depth of the pond. On the date of the onsite inspection, September 28th, 2023, the pond appears consistent with other ponds on rural recreational properties that I have seen during my years of appraising. Further, in my experience, ponds on rural recreational properties do not contribute to the per-acre value of the properties in any significant manner and certainly do not -- do not so based on the depth. Therefore, I attributed no diminution in value for pond sedimentation."

*Id.* at 72:18-24 to 73:1-13.

Rover also offered testimony from Mark Vedral, a former director and now senior director at Energy Transfer who was the onsite, day-to-day operations manager for the Rover Pipeline project. *Id.* at 76:6-8, 19-24 to 77:1-2. He summarized his involvement with the pipeline project since April 2014 before turning to the issues of whether damage to the residue existed. He testified that, contrary to a suggestion by Thomas Shaw (TERA's predecessor landowner) that Rover should have built sediment basins or sediments ponds to prevent sediment from running into the pond on parcel 75, neither the Federal Energy Regulatory Commission ("FERC") nor any other jurisdictional agency required such measures to catch runoff from the construction. *Id.* at 84:1-13.

Vedral testified that, to address sediment issues, Rover used silt fencing that was placed

7

along the boundary of Rover's workspace footprint. *Id.* at 84:14-22. He testified that he was unaware of any FERC inspector or other environmental inspector that had issued any complaints or notices for Rover failing to control erosion on the TERA property. *Id.* at 86:23-24 to 87:1-6. He also testified that FERC and Ohio environmental agencies had approved the plan that Rover had submitted for its operations. *Id.* at 88:2-20. He explained that this plan included separating out top soil from the ditch line created to install the pipeline and then "returning [the property] to its original condition as near as practical." *Id.* at 90:8-20. Rover monitors itself to ensure compliance, Vedral testified, including using drones. *Id.* at 90:21-24 to 91:1-6.

When questioned about the allegation by Shaw that Rover should have shaken removed tree stumps to get more top soil from the stumps in timbered areas, Vedral testified that, to his knowledge, Rover had never done that on any project in the country. *Id.* at 93:5-15. He testified that there was no requirement in the Ohio Agricultural Mitigation Plan to shake tree stumps in this manner. *Id.* at 94:19-23. He also testified that there was no such requirement in the FERC requirements or any other federal or state requirements. *Id.* at 94:24 to 95:1-6. In addition, Vedral testified that, to his knowledge, there was no industry standard that would endorse such shaking of the tree stumps in connection with pipeline construction. *Id.* at 95:8-14.

Vedral proceeded to identify and describe a photograph documenting Rover's soil segregation activities. *Id.* at 96:13-24 to 97:1-21. He testified regarding another photograph, which depicted Rover's silt fence. *Id.* at 100:17-24 to 101:1-6. Vedral also testified regarding Rover's investigators looking into Shaw's pond complaints and concluding that the sediment runoff about which he was concerned was the result of a shed that Shaw had recently installed. *Id.* at 102:15-24 to 103:1-2. 22-24 to 104:1-6.

Finally, Vedral testified regarding the slippage that occurred and the need to procure additional temporary easements to provide workspace for necessary repairs and remediation. *Id.*

at 107:7-24 to 111:1-8. He testified that the repairs had been completed and that there had been no FERC complaints raised regarding the repairs. *Id.* at 111:9-18.

Having considered the foregoing testimony and the related admitted exhibits, the Commission agrees with Herbig's just-compensation analysis and calculation. Four points necessarily attach to this conclusion.

First, the instant just compensation determination is unusual insofar as the presentation of evidence and framing of the issues was one-sided. This statement in no way implies that the presentation by Rover was unfair. In reaching its recommendation, the Commission considered Herbig's testimony and all of the exhibits admitted into evidence. The Commission credits Herbig's testimony and the evidence upon which he relied to calculate the amounts discussed. In so doing, the Commission is cognizant that no Commissioner is duty-bound to accept Herbig's opinion. Considering his background and experience, generally accepted appraising methodology, and the account of how he reached his conclusions, however, the undersigned members of the Commission found Herbig to be a credible, informed, and thoughtful witness. The Commission found his core factual contentions, noted throughout the above discussion, to be credible and adopts them as the findings of the Commission. In noting the unusual nature of a one-sided hearing, then, the Commission is simply noting that there was no contrary evidence presented.

Second, the Commission notes that it is limited to the evidence and the record before it. The evidence before the Commission was only presented by Rover. The lack of opposing evidence left Rover's evidence uncontroverted. For example, the 10% rent rate is uncontroverted. The record contains no evidence of damage to the residue.

Third, the instant just compensation determination is also somewhat unusual because it involves only extended temporary easements. This means that a typical analysis for a permanent easement is not before the Commission—meaning no assessment of the pre-take market value of

9

the property and any diminution in market value of the permanent easement area to create a post-taking market value of the property is necessary.  This leaves the Commission with the task of conducting the only remaining calculation necessary to adduce the fair market value, or fair rental value, of the temporary easements.

Fourth, although TERA had purported to dismiss "damages" claims that it had never formally brought prior to the hearing, there is no evidence here that the "damages" circumstances addressed at the hearing are different than that presented by Rover.  TERA had a duty to speak regarding any claimed damages to the residue and elected to remain silent.  It is TERA's right not to participate in these proceedings, but a consequence of exercising that right is that the evidence presented to the Commission is one-sided—and the basis for the Commission exercising went uncontested.  At the outset of the hearing, Chairperson Judge placed on the record his reasons for permitting Rover to present the damages issue to the Commission.  Hrg. Tr. at 27:1-24 to 29:1-23.  The consequent evidence presented did not establish that Rover caused damage to the residue and, even if some degree of the pond sediment could nonetheless be attributed to Rover, the uncontroverted opinion of Herbig was that any pond sedimentation on the rural recreational parcel involved did not affect the property value.  There is simply no basis on this record to conclude that the residue has been damaged.

Given the foregoing, the recommended just compensation award for the TERA property is comprised of the following:

| | |
|---|---|
| **Market Value Taken** | $0 |
| **Damages to Residue** | $0 |
| **Additional or Previously Uncompensated Temporary Easements** | $10,040 |
| **Total Hearing Compensation Due TERA** | $10,040 |

### Recommendation

The task before the Commission is to recommend the just compensation due TERA. Based on the foregoing findings and discussion, it is the unanimous recommendation of the Commission that the Court order Rover to compensate TERA in the amount of $10,040.[5]

The parties involved in this compensation dispute are reminded that "a party involved in the hearing with which [this report and recommendation] is concerned may file specific and detailed objections to—or a motion to adopt or modify—the [report and recommendation] no later than eleven (11) days after a copy is served." *See* Final Instructions, ECF No. 722 at PageID 11801.

**IT IS SO ORDERED.**

*/s/ Shawn Judge*
Shawn Judge (0069493)
Commission Chair


*/s/ Craig Paynter*
Craig Paynter
Commissioner


*/s/ April Bott Moore*
April Bott Moore
Commissioner

---

[5] Given that the Commission's deliberations have concluded, the hearing exhibits will now be delivered by the Chair to the Court. *See* Final Instructions, ECF No. 722 at PageID 11802.